UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BENJAMIN CORTEZ-GOMEZ | Case No. 20-CR-00422-1<br><br>Judge John Robert Blakey |

**MEMORANDUM OPINION AND ORDER**

On October 29, 2020, the Special January 2020 Grand Jury returned an indictment against Defendant Benjamin Cortez-Gomez charging him with: (1) willfully engaging in dealing firearms without a license in violation of 18 U.S.C. §922(a)(1)(A); and (2) unlawful possession of firearms by a convicted felon in violation of 18 U.S.C. § 922(g)(1). [30].

Defendant has moved to quash his arrest and suppress evidence, including seven firearms recovered from the blue Dodge Charger he was driving when law enforcement arrested him on July 27, 2020. [60]. Defendant argues that law enforcement, including agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), lacked probable cause to arrest him, and that consequently, this Court should exclude all evidence derived from this allegedly unlawful arrest. [60]; *Wong Sun v. United States*, 371 U.S. 471 (1963) (suppressing unlawfully obtained evidence and any "fruit of the poisonous tree").

On July 25, 2022, September 22, 2022, November 9, 2022, and November 16, 2022, this Court held an evidentiary hearing on Defendant's motion. [165], [166].

1

The Government presented testimony from ATF Special Agents Justin Hayes, Thomas Spratte, David Lopez, and Reid Schwartzel. Defendant Sanchez presented the testimony of Cook County Sheriff's Office Investigator Daniel Johnson. The parties also introduced photographs, video recordings, reports, and other evidence, including a factual stipulation [98], and presented oral arguments.

Based upon this record, which includes the materials submitted by the parties and the evidence and argument presented at the hearing, the Court makes the following factual findings and conclusions of law.

I.   **Findings of Fact**

   A.   **Initial Information from a Confidential Informant**

On July 21, 2020, Cook County Sheriff's Investigator Johnson notified ATF Agent Thomas Spratte that a confidential source ("CI") had contacted the Sheriff's Office on July 14 with information about Defendant Benjamin Cortez-Gomez dealing in firearms. The CI was not incarcerated at the time but had a pending case and a personal associate incarcerated at the Cook County Jail. [98]. The CI identified himself/herself to law enforcement and signed an informant agreement with the Sheriff's Office on July 14, D's Exs. 4–6, but the CI had never before worked as an informant for the Cook County Sheriff's Office or ATF.

Agents Spratte and Lopez, along with Investigator Johnson, met with the CI on July 21, 2020. At this meeting, the CI told Agents Spratte and Lopez that Defendant was selling firearms in Chicago and that the CI had made multiple trips with Defendant to Indianapolis to buy firearms. The CI told the agents that on these

2

trips, Defendant drove his car, and the CI stated that the Defendant owns a dark blue Dodge Charger. The CI also reported that, after purchasing the guns, Defendant brought them to 5757 South Campbell Avenue in Chicago, Illinois, where he delivered them, through the back door, to the second floor. The CI confirmed Defendant's identity based upon a booking photograph of Defendant. The CI also stated that Defendant currently lived at 6128 South Carpenter Street in Chicago, Illinois. The CI signed a separate informant agreement with ATF, and the agents told the CI about possible compensation for providing credible information in furtherance of the investigation.

Following this meeting, Agent Spratte corroborated the CI's information by running various background checks on Defendant, which showed that he had multiple felony convictions, including for unlawful firearm possession, and that he was currently on parole and his parole record listed his address as 6128 South Carpenter Street. In the late evening of July 23, 2020, Agents Spratte and Lopez also surveilled the Carpenter Street address and observed a dark blue Dodge Charger parked on the west side of the street with license plate CD 26224. Illinois Secretary of State records further showed that a dark blue 2015 Dodge Charger with Illinois license plate CD 26224 was registered to Defendant's sister at the same Carpenter Street address.

    **B.**     **GPS Tracker Warrant for Dodge Charger**

Based upon the information that the CI provided and the agents' supplemental investigation thus far, the agents sought and obtained judicial authorization on July

3

24 to install a GPS tracker on the Dodge Charger, which they installed that night. In the warrant application, Agent Spratte stated that the CI traveled with Defendant in the Dodge Charger to Indiana to purchase firearms. On July 25, however, Agent Lopez obtained a Carfax report for the Dodge Charger, which showed that the car had only been purchased recently and, therefore, the CI and Defendant could not have traveled in that car to Indiana.

Based upon this new information, the agents immediately disabled the GPS tracker, and Agent Spratte contacted the CI to ask him if the CI drove with Defendant to Indiana in the Dodge Charger. The CI said, no; they had taken Defendant's Ford Fusion. The CI then clarified the information provided in the July 21 interview, explaining that the Defendant drove "his vehicle" when they traveled together to Indiana, and Defendant's "current car" is a Dodge Charger. The CI also stated that the CI knew, based upon Defendant's Facebook posts, that Defendant recently sold the Ford Fusion and bought a Dodge Charger. Agents Spratte and Lopez testified at the evidentiary hearing that they did not believe that the CI lied about the vehicle, but rather the car discrepancy was merely a misunderstanding based upon the agents' questioning.[1]

---

[1] At the evidentiary hearing, Defendant attempted to impugn Agent Spratte's and Agent Lopez's credibility by offering testimony and evidence from Sheriff's Investigator Johnson, who also attended the July 21 interview. Investigator Johnson's report of the July 21 interview stated that the CI "informed investigators that" Defendant and "another individual drive his car, a dark blue Dodge Charger, to Indiana to purchase the firearms due to him not having an active Driver's License." [99] (D's Ex. 7 at 4). Johnson's report summary does not include anything about the CI personally accompanying Defendant on trips to Indiana to purchase firearms. Defendant argues that Johnson's report also establishes that Agents Spratte and Lopez's testimony lacks credibility. The Court disagrees. Although Johnson's report does not state that the CI traveled with Defendant to Indiana, Johnson also testified that he was "in and out of the room but I was there" for the CI interview. [101] at 51:21–22. Further, Agents Spratte and Lopez's testimony remains consistent with the affidavit

C.   **Monitoring Social Media Accounts**

Separately, in the days following this meeting, Agent Spratte continued to communicate with the CI by phone and text message. During these conversations, the CI told Agent Spratte that the CI communicated with Defendant through Facebook and Snapchat. The CI told Agent Spratte that Defendant's Facebook account had the username "Bennie Blanco" and Defendant's Snapchat account had the username "bambamdakilla" and vanity name "Bennie blanco."

Corroborating this information, ATF personnel identified a Facebook account with the username "Bennie Blanco" and found a series of publicly-available images on it of the Defendant. One of those photographs, posted to the account on July 16, 2020, depicted Defendant standing in front of a dark blue Dodge Charger with a license plate ending in "4." *See* Government's Ex. 1.

The CI also sent agents a screenshot of a private Facebook message that, according to the CI, was between the CI and the "Bennie Blanco" account. The screenshot confirmed discussions about purchasing firearms. The CI also told Agent Spratte that Defendant used his "Bennie blanco" Snapchat account to post messages about buying and selling firearms. At Agent Spratte's request, the CI voluntarily provided the CI's Snapchat login credentials.

---

Agent Spratte submitted, under oath, for the GPS tracking warrant application and with the follow-up interview Agent Spratte had with the CI to clarify which vehicle Defendant took on the trips to Indiana with the CI. Accordingly, the Court finds the Agents' testimony about the July 21 meeting credible, notwithstanding what Johnson's report did (or did not) include in the factual summary portion of the report. This Court finds that the CI provided factually accurate information; Defendant drove his car to Indiana, and it was instead the agents who incorrectly conflated the current and prior vehicles Defendant owned.

Using these login credentials and with the CI's consent, Agent Lopez independently monitored the CI's Snapchat account between July 25 and July 27, 2020. On July 25, Agent Lopez viewed a private message from "Bennie blanco" to the CI stating, "I got this one for you wassup 900" and attaching a photograph of a revolver. Government's Ex. 2. On July 26, the CI messaged the "Bennie blanco" account, "What time tomorrow," to which "Bennie blanco" responded, "11 am I'm leaving" and "meet me up by my crib" with $900. Government's Ex. 3 at 2–3. The "Bennie blanco" account then clarified that he did not have the revolver yet but planned to get it from Indiana. He again told the CI to bring money the next morning "cause I'm buying others but ain't gonna have enough." *Id.* Later in the evening, however, "Bennie blanco" messaged that he could not sell the revolver to the CI because "my guy says he wants it And I cant say no he pays top dollar." *Id*. at 8.

Also on July 26, 2020, Agent Lopez used his consensual access to the private account to review "stories" that the "Benny blanco" account posted within the prior 21 hours. They included: (1) a video compilation of driving while filming police activity, which showed a vehicle dashboard which Agent Lopez testified he recognized as a Dodge Charger dashboard; (2) a video timestamped 2:54 a.m. and dated July 26, 2020, which depicted a dark sedan (with a driver wearing a red shirt) doing donuts on a street and which Agent Lopez testified he recognized as a Dodge Charger; and (3) a video timestamped 5:52 a.m. that first depicted a residential sidewalk, then the camera lens flipped revealing a close-up of Defendant himself (who was holding the camera filming himself and was wearing a red shirt), and then the lens flipped yet

6

again to show Defendant get in the driver side of a dark blue Dodge Charger. *See* Government's Exs. 4, 5.

### D. July 27, 2020 Surveillance of Charger and Arrest of Defendant

Because Defendant (via the "Benny blanco" account) had messaged the CI that he planned to go to Indiana on July 27 to buy the depicted revolver and "others," ATF Agent Hayes set up surveillance on Defendant's Carpenter Street residence in the early-morning hours of July 27. Agent Hayes testified that he observed the Dodge Charger parked on the street near Defendant's residence. Consistent with the plan Defendant described to the CI via the "Bennie blanco" account, at approximately 9:59 a.m., Defendant exited the residence and went to the Dodge Charger, where he opened the driver's side door, trunk, and front hood. Defendant went back inside the house; returned to the car at 10:52 a.m.; and then went back inside the house. Then, at approximately 12:05 p.m., the Dodge Charger left the area. Agent Hayes testified, however, that another vehicle had partially obstructed his view of the Charger, so he did not see who entered it before it drove off. He also could not see inside the Charger because it had tinted windows.

Agent Hayes followed the Charger, and Agent Spratte joined the surveillance in a different vehicle. Both testified that the Charger traveled to 5757 South Campbell Avenue (the same location that the CI had told Agents Spratte and Lopez that Defendant had used previously as a stash house during prior firearms purchases from Indiana). Government's Ex. 10A, 10B. There, a man briefly approached the Charger and then walked away (agents were not in a position to identify this man);

7

the Charger then traveled to a Bank of America ATM/teller drive-thru down the street, and then stopped back in front of 5757 South Campbell Avenue before getting on the interstate heading toward Indiana.[2] Agents tracked the Charger until 12:49 p.m., when it crossed into Indiana. At that point, agents stopped following it.

Meanwhile, Agent Lopez continued to monitor the CI's Snapchat account. He also spoke to the CI and instructed the CI to send a message to the Defendant via the "Benny blanco" account asking where he was. At 2:14 p.m., the CI texted the "Benny blanco" account, "Whatchu on"; and at 2:31 p.m., Defendant, via the "Benny blanco" account, responded, "Indiana" and "I got a 45 for sale thoo. 1k." Government Ex. 6 at 1. The CI asked Defendant/"Benny blanco" to send "pictures of what you got," to which Defendant/"Benny blanco" responded, "I'm driving mf wait." *Id.* at 2. Then, at 3:58 p.m., Defendant/"Benny blanco" sent the CI a video and a photograph. The video showed a car's front seat upon which sat an open gray gun case containing a firearm in plain view. *Id.* at 4. Agent Lopez testified that, based upon his experience and training, he recognized the firearm as a Heckler and Koch pistol. The photograph Defendant sent depicted what appeared to be the same gun case and pistol. Government Ex. 7. Then, at 4:45 p.m., Defendant/"Bennie blanco" sent the CI another video, this one showing six firearm cases on the backseat of a car with a caption that read, "No Caption Needed." Government Ex. 8.

Based upon this information and public safety concerns, the agents decided to interdict Defendant as he illegally transported the firearms in the Dodge Charger.

---

[2] Agent Hayes testified that multiple agents observed the Charger near 5757 South Campbell Street, and none of them saw anyone exit or enter the Charger.

Agents communicated by text message and radio/phone as they attempted to relocate the Dodge Charger in Indiana, later identified the Charger traveling on the Indiana 90/94 interstate toward Chicago, and began tracking it using unmarked vehicles and aerial surveillance. Government Ex. 9. During the surveillance, aerial units reported to agents on the ground that the Charger pulled off the highway, and the male driver exited the Charger to change or put on a new front license plate. *Id.* Later, while still in Indiana, the Charger got off the highway again. Agent Schwartzel, in an unmarked car, followed the Charger off the highway. He testified that, once off the highway, he passed a Circle K gas station and observed the Charger and a man standing next to it who positively matched Defendant's booking photograph. *See* Government's Ex. 13 at 18–19.

At approximately 7:30 p.m., agents interdicted the Charger as it exited the interstate at 59th Street in Chicago, Illinois. Given the presence of firearms and tinted windows, the agents approached the vehicle with guns drawn and arrested the Defendant. They also searched the car and recovered seven firearms from the trunk.

## II. Conclusions of Law

### A. Probable Cause Standard

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Under the Fourth Amendment, "seizures" are "reasonable only if based on probable cause to believe that the individual has committed a crime." *Lewis v. City of Chi.*, 914 F.3d 472, 476 (7th Cir. 2019) (quoting *Bailey v. United States*, 568 U.S 186, 192 (2013)). Probable cause to justify an arrest

9

exists "if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013).

Under this standard, the relevant circumstances encompass the entire factual picture, including rational inferences drawn from the facts based upon the experience of the officers; thus, the existence of probable cause "does not deal with hard certainties," but rather "with probabilities." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)). Although probable cause requires "something more than a hunch," it does not require a finding that an individual engaged in any unlawful activity. *Abbott*, 705 F.3d at 714. It requires "only a substantial chance of criminal activity, not an actual showing of such activity." *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003). This analysis looks at all of the relevant circumstances "from the perspective of what the officers knew at the time of the arrest," *Fox v. Hayes*, 600 F.3d 819, 832 (7th Cir. 2010), and "is not a post hoc determination," *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). Probable cause exists even though there "could have been innocent explanations" for a defendant's actions, so long as "the inference of the criminal activity was reasonable." *United States v. Gary*, 790 F.3d 704, 707–708 (7th Cir. 2015) (citing *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003)).

Moreover, when officers rely upon testimonial evidence to help establish the existence of probable cause, the court will consider various factors to assess the

source's reliability, including whether the source relayed first-hand or second-hand information, *United States v. Towns*, 913 F.2d 434, 440–41 (7th Cir. 1990); whether the source was an identified citizen or victim (who would be entitled to a presumption of reliability) or rather an anonymous source or confidential informant (requiring more caution in assessing credibility), *id.*; whether the source had a prior record of supplying reliable information, *United States v. Douglas*, 55 Fed.Appx. 769, 770–71 (7th Cir. 2003); and whether the source was speaking against his or her own penal self-interest, *United States v. Olson*, 408 F.3d 366, 371 (7th Cir. 2005).

The Court will also review any future predictions made by the source and whether those predictions came to fruition, because such predictions demonstrate "a special familiarity" with the defendant's affairs and give the court "reason to believe not only that the caller was honest but that he was well informed." *Alabama v. White*, 496 U.S. 325, 332 (1990). Further, the Court will pay particular attention to any corroboration of the information upon which officers relied, including whether other evidence in the case is consistent with the source, *Towns*, 913 F.2d at 440–41; whether the corroborated facts or predictions are criminal or non-criminal in nature, *United States v. Robinson*, 724 F.3d 878, 884–85 (7th Cir. 2013); and whether the information provided by the source related to public or private matters, *see United States v. Spach*, 518 F.2d 866, 871 (7th Cir. 1975).

Throughout this analysis, the probable cause inquiry remains an objective one; the subjective motivations of the officer cannot invalidate a seizure otherwise supported by probable cause. *See Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451,

457 (7th Cir. 2010). In other words, although this Court focuses upon what the officers knew collectively "at the time of the arrest," it must determine "whether those facts and circumstances, 'viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause.'" *Id*. (quoting *Maryland v. Pringle,* 540 U.S. 366, 371 (2003)).[3]

### B. Probable Cause Existed in this Case

Applying the traditional *Gates* analysis, the record confirms the existence of probable cause. Here, the agents relied upon a testimonial source, an identified cooperating informant, whose evidence included first-hand information. Even though this CI had no prior record of reliability with law enforcement, the source provided information against the CI's own penal self-interest, and this information remained consistent with the information derived from other sources (including public records, law enforcement databases, and Defendant's own social media posts).

The agents also obtained historical corroboration of the CI's information, including confirmation of facts both criminal and non-criminal in nature, and relating to both public and private matters. For example, agents corroborated the fact that the Defendant lived at 6128 South Carpenter and that a blue Dodge Charger was

---

[3] Under the "collective knowledge" doctrine, the officers "who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency." *United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018) (quotations and citations omitted). In such cases, an arrest is proper so long as the "collective knowledge of the agency" is "sufficient to constitute probable cause." *Id.*; *see also United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (An officer's stop is reasonable if it is justified based upon "the collective knowledge" of officers investigating as part of a joint endeavor, even if the individual arresting officer's firsthand knowledge remains insufficient on its own.); *United States v. Ledford,* 218 F.3d 684, 689 (7th Cir. 2000) (if the search or seizure constitutes a "joint endeavor," the court may properly consider what other officers knew and impute that collective knowledge to the officers taking action).

12

registered to his sister at the same address, and they also corroborated evidence of criminal activity, including the fact that Defendant had prior felony convictions related to firearms, that Defendant offered to sell the CI firearms (despite being a convicted felon), and that Defendant visited 5757 South Campbell, the address where the CI stated Defendant stashed the illicit firearms. Likewise, the CI provided agents with access to social media accounts, which provided them with information about current and future events that were both criminal and not publicly known. For instance, Defendant messaged the CI on social media (while the agents had access to the CI's account), informing the CI that he was going to Indiana to purchase firearms. Agents set up surveillance and thereafter observed an individual, who they subsequently identified as Defendant, driving the blue Dodge Charger as part of the Indiana gun deal. After Defendant crossed into Indiana, agents also confirmed that Defendant sent the CI videos and a photograph of firearms in his car via social media. In short, the investigation revealed more than enough evidence to support Defendant's arrest.

Despite the factual record noted above, Defendant argues that the agents lacked probable cause to arrest him on July 27, because the only information they possessed came from a first-time CI who failed to provide sufficiently detailed information to suggest reliability, had a motive to lie and, in fact, had purportedly lied to the agents about taking trips to Indiana with Defendant in his Dodge Charger. [60]. Defendant also argues that the agents failed to corroborate the CI or the fact that the Snapchat "Bennie blanco" account belonged to Defendant; and

13

therefore, the agents had no factual basis to believe that Defendant was the one driving the Dodge Charger loaded with firearms when they stopped it at the 59th Street exit. *Id.*

In support, Defendant relies upon *United States v. Lopez*, 907 F.3d 472 (7th Cir. 2018). *See* [60] at 7, 10–11. In *Lopez*, an informant, previously unknown to law enforcement, told officers that he transported drugs from the defendant's home. After the informant shared this information, the officers released him, and he refused to cooperate any further. *Lopez*, 907 F.3d at 476. Nonetheless, the next day officers surveilled the defendant's home briefly, and then conducted a *Terry* stop and frisk of defendant based upon the informant's initial information. *Id.* at 476–77.

The Seventh Circuit held that the informant's tip alone lacked sufficient indicia of reliability to establish reasonable suspicion to conduct a *Terry* stop and frisk. *Id.* at 479–83. The court noted that the officers only knew the informant's identity and did nothing at all to corroborate his claims, other than confirm the defendant's name and home address. *Id.* The court found that this did not suffice; instead, the officers needed some corroboration "that would indicate the tip was 'reliable in its allegation of illegality.'" *Id.* at 481 (quoting *Florida v. J.L.*, 529 U.S. 266, 272 (2000)).

Defendant argues that the informant in *Lopez* is like the CI here and, if the informant in *Lopez* could not support the "reasonable suspicion" standard that applies to *Terry* stops, then the CI's information here cannot support the

14

heightened "probable cause" standard that applies to warrantless arrests. [60] at 11. As discussed below, however, the record in this case proves markedly different from the facts of *Lopez*.

First, with respect to the CI's credibility, although the CI had not worked as an informant before, the CI continually cooperated with the agents and provided additional information over time. Second, even though Defendant insists that the CI lied to agents, the record does not support this assertion. To the contrary, Agents Spratte and Lopez (who this Court found credible at the evidentiary hearing) both testified that they did not believe that the CI lied about the vehicle taken on the trip with the Defendant to Indiana, and instead the confusion stemmed from a miscommunication. Indeed, based upon the record, this Court has made the factual finding that the CI did not, in fact, lie to the agents. Nevertheless, the relevant inquiry here is not whether the CI lied, but rather whether an objectively reasonable officer would have found the CI credible at the time. *Carmichael*, 605 F.3d at 457. The Court finds the agents' assessment of the CI's credibility remained objectively reasonable, particularly given the other facts that the agents possessed and the CI's explanation for the minor confusion over the two cars Defendant owned.

Third, unlike the officers in *Lopez*, the agents here took numerous steps to corroborate the CI's statements, and their investigation revealed facts that, taken together and viewed from the standpoint of an objectively reasonable officer, established probable cause to believe at the time of the arrest that Defendant was

15

driving the Dodge Charger and unlawfully possessed multiple firearms. *See Abbott*, 705 F.3d at 714; *Gates*, 462 U.S. at 231. Indeed, even if one disregards the CI's July 21 specific statement about personally traveling with Defendant to Indiana in Defendant's car, the other information that the agents gathered during the investigation established probable cause for Defendant's July 27 arrest.

As detailed above, the agents verified the CI's information and confirmed via other evidence that Defendant was a convicted felon, resided where the CI claimed, and had access to a Dodge Charger registered in his sister's name. The agents also personally observed the Dodge Charger parked at Defendant's home, and they used their independent access to Defendant's Facebook and Snapchat account information (access provided with the CI's information and consent) to confirm Defendant's unlawful possession of firearms and firearms dealing via pictures and videos, as well as private communications with the CI.[4]

---

[4] Defendant suggests that the CI—motivated by money or hoping to get a deal on a pending case or the case of the CI's personal associate—may have manufactured a fake Snapchat account. [60] at 12–13. Or, Defendant argues, at a minimum, nothing besides the CI's say-so suggested that the "Bennie blanco" account belonged to Defendant. *Id.* Not so. To the contrary, this Court finds that the record confirms Defendant's ownership and control of the social media accounts using the names "Bennie Blanco" and "Bennie blanco," respectively. For example, the agents observed photographs and videos on both accounts depicting Defendant including, among others: (1) a photo on the Facebook account that depicted Defendant standing in front of a Dodge Charger with a license plate ending in the same number as the license plate of the Dodge Charger registered to his sister; (2) a "selfie" video on the Snapchat account, taken in the early morning hours of July 26, while driving a Dodge Charger; and (3) another "selfie" video on the Snapchat account, taken later in the morning of July 26 in which Defendant gets into the driver's seat of a Dodge charger. The agents also personally observed events that corroborated the authenticity of the "Bennie blanco" Snapchat account as being the Defendant's account, as well as the fact that Defendant was driving the Dodge Charger on July 27, and unlawfully possessed multiple firearms. For example, through the CI's own Snapchat account, Agent Lopez observed the "Bennie blanco" account send messages that discussed purchasing guns from Indiana on July 27. Consistent with these messages, on July 27 Agent Hayes observed Defendant enter the Dodge Charger parked outside his home multiple times appearing to get ready for a trip to purchase firearms. Shortly after, Agent Hayes observed the Dodge Charger leave the residence. Agents then observed the Dodge Charger stop at 5757 South Campbell Avenue—the same address where, according to the

Consistent with the Snapchat messages from "Bennie blanco" to the CI, the agents observed the Dodge Charger travel into Indiana. A few hours later, the same "Bennie blanco" account messaged the CI that the Defendant was driving in Indiana and had "a 45 for sale thoo. 1k."[5] Shortly thereafter, the "Bennie blanco" account sent a video and photograph of a 45 caliber Heckler and Koch pistol sitting on the front seat of a vehicle. Not long after that, the "Bennie blanco" account sent another video showing six firearm cases sitting on the backseat of a vehicle.

Once the agents re-gained surveillance of the Dodge Charger on the Indiana interstate (confirmed by the license plate number), aerial surveillance observed the Charger's driver—a male—exit the vehicle and change or reattach a front license plate. Further, Agent Schwartzel—who was surveilling the Charger from his undercover vehicle—observed the Charger stop at a Circle K gas station and testified that he saw a man standing next to the Charger who positively matched Defendant's booking photograph. Although Agents Spratte, Hayes, and Lopez testified that they did not personally observe Defendant driving the Charger on July 27, under the

---

CI, Defendant would bring firearms that he purchased in Indiana. Agents also observed the Dodge Charger stop at a Bank of America drive-thru, and agents testified that, based upon their training and experience, this remained consistent with someone withdrawing money for firearm purchases. It also corroborates the Snapchat messages in which "Bennie blanco" told the CI that he needed additional money to purchase the firearms. The factual record simply does not support Defendant's theory that a third party, either the CI or someone else, may have fraudulently posted the videos of Defendant to the "Bennie blanco" account. Even if the agents' investigation did not reveal with absolute certainty that the "Bennie blanco" account belonged to Defendant (which it did), the existence of probable cause "does not deal with hard certainties"; instead, it deals "with probabilities," and law enforcement may draw rational inferences from the facts and based upon their experiences. *Gates*, 462 U.S. at 231. Based upon the evidence, this Court finds that the social media accounts, in fact, belonged to Defendant and the agents' belief that they did so remained objectively reasonable.

[5] Agent Lopez testified that, based upon his training and expertise, this referred to a 45-caliber firearm for $1,000.

"collective knowledge" doctrine, the observations by the aerial surveillance team and Agent Schwartzel remain part of the totality of information to support probable cause. *Howard*, 883 F.3d at 707 (7th Cir. 2018).

These facts and circumstances, taken together, establish that the agents reasonably believed that Defendant was the individual sending messages from the "Bennie blanco" account to the CI; that he was the individual driving the Dodge Charger on July 27; that he had traveled to Indiana to purchase firearms; and that he illegally possessed multiple firearms as he crossed from Indiana into Chicago on July 27. Accordingly, given the existence of probable cause, the agents did not violate Defendant's Fourth Amendment rights when they arrested him.

### III. Conclusion

Based upon the above, the Court denies Defendant's Motion to Quash his Arrest and Suppress Evidence, [60].

Date: July 7, 2023

ENTERED:

_____
John Robert Blakey
United States District Judge